## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF MISSISSIPPI
## ABERDEEN DIVISION

TRAVON DEANGELO BROWN                                         PETITIONER

v.                                                  No. 1:17CV137-GHD-RP

SUPERINTENDENT JAQUELYN BANKS, ET AL.                    RESPONDENTS

### MEMORANDUM OPINION

This matter comes before the court on the *pro se* petition of Travon DeAngelo Brown for a

writ of *habeas corpus* under 28 U.S.C. § 2254. The State has responded to the petition; Mr. Brown

has filed a Traverse, and the matter is ripe for resolution. For the reasons set forth below, the instant

petition for a writ of *habeas corpus* will be denied.

### *Habeas Corpus* Relief Under 28 U.S.C. § 2254

The writ of *habeas corpus*, a challenge to the legal authority under which a person may

be detained, is ancient. Duker, The English Origins of the Writ of Habeas Corpus: A Peculiar

Path to Fame, 53 N.Y.U.L.Rev. 983 (1978); Glass, Historical Aspects of Habeas Corpus, 9 St.

John's L.Rev. 55 (1934). It is "perhaps the most important writ known to the constitutional law

of England," *Secretary of State for Home Affairs v. O'Brien*, A.C. 603, 609 (1923), and it is

equally significant in the United States. Article I, § 9, of the Constitution ensures that the right

of the writ of *habeas corpus* shall not be suspended, except when, in the case of rebellion or

invasion, public safety may require it. *Habeas Corpus*, 20 Fed. Prac. & Proc. Deskbook § 56.

Its use by the federal courts was authorized in Section 14 of the Judiciary Act of 1789. *Habeas*

*corpus* principles developed over time in both English and American common law have since

been codified:

The statutory provisions on *habeas corpus* appear as sections 2241 to 2255 of the

> 1948 Judicial Code. The recodification of that year set out important procedural
> limitations and additional procedural changes were added in 1966. The scope of the
> writ, insofar as the statutory language is concerned, remained essentially the same,
> however, until 1996, when Congress enacted the Antiterrorism and Effective Death
> Penalty Act, placing severe restrictions on the issuance of the writ for state prisoners
> and setting out special, new *habeas corpus* procedures for capital cases. The changes
> made by the 1996 legislation are the end product of decades of debate about *habeas
> corpus*.

*Id.* Under 28 U.S.C. § 2254, a federal court may issue the writ when a person is held in violation of

the *federal* Constitution or laws, permitting a federal court to order the discharge of any person held

by a *state* in violation of the supreme law of the land. *Frank v. Mangum*, 237 U.S. 309, 311, 35 S. Ct.

582, 588, 59 L. Ed. 969 (1915).

## Facts and Procedural Posture

Travon Brown is in the custody of the Mississippi Department of Corrections ("MDOC") and

currently housed at the South Mississippi Correctional Facility in Leakesville, Mississippi. Mr.

Brown was convicted of two (2) counts of murder in the Circuit Court of Lee County, Mississippi. On

November 7, 2013, he was ordered to serve consecutive terms of life imprisonment in the custody of

the MDOC. *See* S.C.R. Vol 3, p. 295.[1]

Brown appealed the judgment to the Mississippi Supreme Court, raising the following issues,

through counsel:

A.    The trial court erred in denying several jury instructions.

B.    The trial court erred in excluding evidence of Harris and Ruffin's toxicology.

C.    The evidence was insufficient to support the verdict; alternatively, the verdict
      was against the overwhelming weight of the evidence.

---

[1] References to the state court record from Brown's direct appeal of his conviction and
sentence are designated herein as "SCR" with the appropriate volume and page number.

D.    Brown received ineffective assistance of counsel.[2]
      1. Counsel failed to offer a manslaughter instruction.
      2. Counsel failed to object to prosecutor's argument in closing.

Brown filed a supplemental brief on appeal, as well as numerous motions to amend that brief, in which he further addressed the arguments made by his appellate counsel, but also raised, *inter alia,* additional claims challenging not only that certain DNA evidence was collected but not tested or preserved properly, but also that such evidence was suppressed by the prosecution and that counsel was ineffective for failing to raise a claim of evidence tampering.[3]

On November 10, 2015, Travon Brown's convictions and sentences were affirmed by the Mississippi Supreme Court. *See Brown v. State*, 194 So. 3d 139 (Miss. Ct. App. 2015), *reh'g denied,* April 5, 2016 and April 26, 2016, *cert denied*, July 21, 2016 (Cause No. 2014-KA-00020). Brown argued in several pleadings filed after his appeal was affirmed that the Court of Appeals failed to address several issues he raised *pro se* on appeal. *See* Record in Cause No. 2014-KA-00020). In an *en banc* Order filed July 6, 2016, the Mississippi Supreme Court found that:

> Before the Court of Appeals, Brown argued his attorney was ineffective for failing to raise allege[d] evidence tampering. He also argued DNA evidence was collected that was not tested or preserved properly. After due consideration, the Court finds the claims are not based on facts fully apparent from the record and would be best raised in a properly filed motion for post-conviction relief. Accordingly, the Court dismisses

---

[2] The court has summarized the claims of ineffective assistance of counsel Brown's counsel raised on direct appeal. Appellate counsel also noted in his brief that "Brown believes he received ineffective assistance of counsel in additional respects that are not sufficiently 'apparent in the record' for review on direct appeal, as required by Mississippi Rule of Appellate Procedure 22(b)" and requested that those additional claims be preserved to be properly raised during post-conviction proceedings, if necessary. *See* Brief of Appellant, p. 30.

[3] The State filed a supplemental brief in response to that *pro se* brief and any supplemental motions accompanying that brief. The State's supplemental brief addressed what appellate counsel construed the pleadings filed by Brown to raise as two additional claims of ineffective assistance of counsel: (1) counsel failed to defend him when the State sought to exclude the victim's toxicology results, and (2) counsel failed to allege that law enforcement officers might have manipulated the crime scene. *See* Supplemental Brief of Appellee.

Brown's motions without prejudice to his ability to raise the issues in post-conviction proceedings. *See Claiborne v. State*, 176 So. 3d 769, 775 (Miss. 2015).

*See* Exhibit B (Order in Cause No. 2014-CT-00020) (emphasis in original).

Mr. Brown, proceeding *pro se*, filed a "Motion for Post-Conviction Relief" in the Mississippi Supreme Court, raising the following issues for the state court's review in the "Concise Statement of the Claims or Grounds Upon Which Motion is Based" (as stated verbatim by the petitioner):

A.  Violation of due process; violation of right to fair trial; ineffective assistance of counsel; plain error in violation of MS Rules of Evidence Rule 103(d). ("The Verdict is Against the Overwhelming Weight of the Evidence").

B.  Failure to preserve biological evidence in violation Miss. Code Ann. § 99-49-1(3), (4) and (5) / Request for DNA testing.

C.  That there exists evidence of material facts not previously presented and heard that requires vacation of the conviction and sentence in the interest of justice, *i.e.*, "illegal evidence admitted at trial." ("The Verdict is Against the Overwhelming Weight of the Evidence.").

D.  The convictions and sentences were imposed in violation of the Constitution of the United States and Constitution and laws of the State of Mississippi. ("The Verdict is Against the Overwhelming Weight of the Evidence.").

E.  That there exists biological evidence secured in relation to the investigation or prosecution not testified, or if previously tested, that can be subjected to additional DNA testing, that would provide a reasonable likelihood of more probative results, and that testing would demonstrate by reasonable probability the petitioner would not have been convicted, or would have received a lesser sentence if favorable results had been obtained through such forensic testing at time of original prosecution.

*See* Record in Mississippi Supreme Court Cause No. 2013-M-02044.  In his "Motion to Amend Petition for Post-Conviction Relief," Brown added the following claim:

F.  That the attached indictment upon which Petitioner was tried is fatally defective in that it fails to state a prosecutable offense in each alleged count.

Brown attached to his application for leave to proceed a "Motion for Post-Conviction Relief / DNA Testing /Or in the Alternative Vacation of Petitioner's Sentences and Convictions for Failure to Preserve Biological Evidence in violation of Miss. Code Ann. § 99-49-1(3)(4)(5) as a remedy for post-conviction relief; Release from Unlawful Custody in the Mississippi Dept of Corr." *See* Record in Mississippi Supreme Court Cause No. 2013-M-02044. In that motion, Mr. Brown argued that, under state law and *Brady v. Maryland*, 373 U.S. 83 (1963), there was DNA evidence that was not properly preserved; evidence was suppressed by the prosecution and not properly tested; and counsel was ineffective for failing to pursue a claim that law enforcement allegedly tampered with evidence and in failing to raise the DNA issue at trial.

On May 31, 2017, the Mississippi Supreme Court found that Brown's application challenged that "his convictions were against the weight of the evidence and his indictment was defective." *See* Exhibit C (Cause No. 2013-M-02044).[4] The court further added that the "issues raised by Petitioner lack sufficient merit to warrant an evidentiary hearing" and denied Brown's application. *Id.*

In the instant *pro se* federal petition for a writ of *habeas corpus*, Mr. Brown raises the following claims, quoted verbatim:

> **Ground One**: Whether Brown's counsel was ineffective for failure to allege that law enforcement moved the X-Box from the living room to the back bedroom in a scheme to enable the prosecution to convict him of murder [that Counsel failed to investigate and confront the witnesses and evidence against him].

---

[4] Mr. Brown labeled three of the five issues set forth in the statement of issues in his application challenges to the weight of the evidence. His supplement to that application raised the additional issue challenging the indictment. The only other issues that Brown set forth in his concise statements of the claims in his application were a request for DNA testing (which his attached motion appeared to address) and an issue where he quoted the language set forth in the state's post-conviction statutes addressing DNA evidence as a potential ground for relief in post-conviction. The court has construed the Mississippi Supreme Court's order to find that the two issues specifically stated by Brown (regarding weight of the evidence and the indictment) lacked merit – and that Brown's other claims regarding DNA testing and the arguments raised in support lacked merit because he failed to show that he was entitled to a hearing on those issues.

**Ground Two**: Whether the State of Mississippi violated Brown's rights to due process and right to a fair trial by suppressing exculpatory biological evidence favorable to him and knowingly used fraud, falsified evidence, and perjured testimony in order to convict him.

**Ground Three**: Whether the State of Mississippi violated petitioner's right to due process and fair trial by failing to observe exculpatory biological evidence.

**Ground Four**: Whether the Mississippi Court of Appeals and/or the Mississippi Supreme Court denied petitioner due process and a right to be heard on direct appeal or in other post-trial/post-conviction proceedings when it affirmed Petitioner's convictions and sentences on direct appeal and denied his motion for leave to proceed to file for post-conviction in the trial court as lacking sufficient merit?

The court will discuss these grounds for relief in turn below.

### The Doctrines of Procedural Default and Procedural Bar

Mr. Brown has defaulted his claim in Ground One that counsel should have raised an argument that test results of Cornelius Harris's DNA found on the Glock were either withheld or destroyed.[5] He has likewise procedurally defaulted his claim in Ground Two that the State knowingly offered "perjured" testimony of Dexter Babbitt and Telvis Ragin at trial. Brown's counsel did not raise these claims on direct appeal; nor did Brown raise them during post-conviction review.[6] If an inmate seeking *habeas corpus* relief fails to exhaust an issue in state court – and no more avenues exist to do so – under the doctrine of *procedural default* that issue cannot be raised in a

---

[5] Though the court must dismiss this claim under the doctrine of procedural default, as discussed in a later section, the claim is also without substantive merit.

[6] As noted above, in ruling on Mr. Brown's Petition for Writ of Mandamus, the Mississippi Court of Appeals deferred ruling on his *pro se* issues raised on direct appeal – without prejudice to his ability to raise those claims during post-conviction proceedings because the facts underlying these claims could best be developed during post-conviction. Mr. Brown did not raise these claims (the State's presentation of "perjured" testimony and ineffective assistance of counsel regarding the presence of Mr. Harris' DNA on the Glock pistol) during his pursuit of post-conviction collateral relief.

federal *habeas corpus* proceeding. *Sones v. Hargett*, 61 F.3d 410, 416 (5th Cir. 1995). Similarly, federal courts have no jurisdiction to review a *habeas corpus* claim "if the last state court to consider that claim expressly relied on a state ground for denial of relief that is both independent of the merits of the federal claim and an adequate basis for the court's decision." *Roberts v. Thaler*, 681 F.3d 597, 604 (5th Cir. 2012). Thus, a federal court may not consider a *habeas corpus* claim when, "(1) a state court [has] declined to address [those] claims because the prisoner [has] failed to meet a state procedural requirement, and (2) the state judgment rests on independent and adequate state procedural grounds." *Maples v. Thomas*, 565 U.S. 266, 132 S.Ct. 912, 922, 181 L.Ed.2d 807 (2012) (alterations in original) (internal quotation marks omitted). This doctrine is known as *procedural bar*.

A state procedural rule is "independent" when the state law ground for decision is not "interwoven with the federal law." *Michigan v. Long*, 463 U.S. 1032, 1040, 103 S. Ct. 3469, 77 L. Ed. 2d 1201 (1983). A state law ground is interwoven with federal law if "the state has made application of the procedural bar depend on an antecedent ruling on federal law [such as] the determination of whether federal constitutional error has been committed." *Ake v. Oklahoma*, 470 U.S. 68, 75, 105 S. Ct. 1087, 84 L. Ed. 2d 53 (1985); *see also* State court decision must not be interwoven with federal law, Federal Habeas Manual § 9B:24.

To determine the adequacy of the state procedural bar, this court must examine whether the state's highest court "has strictly or regularly applied it." *Stokes v. Anderson*, 123 F.3d 858, 860 (5th Cir. 1997) (*citing Lott v. Hargett*, 80 F.3d 161, 165 (5th Cir. 1996)). The petitioner, however, "bears the burden of showing that the state did not strictly or regularly follow a procedural bar around the time of his appeal" – and "must demonstrate that the state has failed to

-7-

apply the procedural bar rule to claims identical or similar to those raised by the petitioner himself." *Id.*

**Cause and Prejudice – and Fundamental Miscarriage of Justice –<br>As Ways to Overcome Procedural Bar**

Whether a petitioner's claims are procedurally defaulted or procedurally barred, the way he may overcome these barriers is the same. First, he may overcome the procedural default or bar by showing cause for it – and actual prejudice from its application. To show cause, a petitioner must prove that an external impediment (one that could not be attributed to him) existed to prevent him from raising and discussing the claims as grounds for relief in state court. *See United States v. Flores*, 981 F.2d 231 (5th Cir. 1993). To establish prejudice, a petitioner must show that, but for the alleged error, the outcome of the proceeding would have been different. *Pickney v. Cain*, 337 F.3d 542 (5th Cir. 2003). Even if a petitioner fails to establish cause for his default and prejudice from its application, he may still overcome a procedural default or bar by showing that application of the bar would result in a fundamental miscarriage of justice. To show that such a miscarriage of justice would occur, a petitioner must prove that, "as a factual matter, that he did not commit the crime of conviction." *Fairman v. Anderson,* 188 F.3d 635, 644 (5th Cir. 1999) (citing *Ward v. Cain,* 53 F.3d 106, 108 (5th Cir. 1995)). Further, he must support his allegations with new, reliable evidence – that was not presented at trial – and must show that it was "more likely than not that no reasonable juror would have convicted him in light of the new evidence." *Fairman,* 188 F.3d at 644 (citations omitted).

In this case, Mr. Brown did not raise these two issues during direct appeal or on post-conviction collateral review; as such, he has no avenue remaining to seek review in the Mississippi Supreme Court. When "it is obvious that the unexhausted claim would be procedurally barred in

- 8 -

state court, we will forego the needless 'judicial ping-pong'" and hold the claim procedurally barred from habeas review." *Sones, supra* (citations omitted). Mr. Brown has thus defaulted these claims, as discussed above, by failing to raise the issues before the state's highest court in his application for leave to seek post-conviction relief.

Mr. Brown cannot show "cause" under the "cause and prejudice" test necessary to allow this Court to reach the merits of the claims despite the procedural bar because no external impediment existed to prevent him from raising and discussing these claims properly as grounds for relief in state court. That is, Brown cannot show "cause" because he, himself, decided which claims he wanted to raise in state post-conviction and chose to omit these specific claims. *See United States v. Flores*, 981 F.2d 231 (5th Cir. 1993).[7] Therefore, absent a showing of "cause," the court need not consider whether there is actual prejudice. *Martin v. Maxey*,98 F.3d 844, 849 (5th Cir. 1996).

In addition, there will be no "fundamental miscarriage of justice" if Brown's claims are not heard on the merits, as he has not shown that he is actually innocent of the murders. *Fairman v. Anderson*, 188 F.3d 635, 644 (5th Cir. 1999) (citing *Ward v. Cain*, 53 F.3d 106, 108 (5th Cir. 1995)). Mr. Brown has not met this standard because he has presented no evidence (certainly not new, reliable

---

[7] Attorney error can constitute cause to overcome the bar – when such error rises to the level of the denial of effective assistance of counsel. *See Murray v. Carrier*, 477 U.S. 478, 488 (1986). However, Mr. Brown proceeded *pro se* in his application for leave to file a motion for post-conviction relief and certainly had the right to raise these issues to the court. Indeed, Mr. Brown actually argued a claim of ineffective assistance of counsel, but did not argue the specific issue of ineffective assistance discussed above (even though the Mississippi Court of Appeals explicitly preserved these issues for collateral review). *See Wilder v. Cockrell*, 274 F.3d 255, 261(5th Cir. 2001) (each individual claim of ineffective assistance of counsel must be exhausted separately). Further, Mr. Brown did not raise a claim of ineffective assistance of trial counsel challenging counsel's failure to object to the testimony that Brown contends was "perjured" during post-conviction review. As such, he may not argue attorney error as cause to overcome the procedural bar applied to the claim in Ground Two discussed above. *See Edwards v. Carpenter,* 529 U.S. 446, 452 (2000).

-9-

evidence) which would show that it was "more likely than not that no reasonable juror would have convicted him in light of the new evidence." *Fairman*, 188 F.3d at 644 (citations omitted). As such, he has not shown that a fundamental miscarriage of justice would result if the court does not consider the merits of his claims. The court is thus prohibited from considering the merits of these two claims in Grounds One and Two under the doctrine of procedural default.

### Factual Background

A summary of the facts in this case will aid in the analysis of Mr. Brown's *habeas corpus* claims. Travon Brown shot and killed Cornelius "Snoop" Harris and Felisha Ruffin in their home after visiting with them that night. Officers arrived on the scene within minutes of receiving a 911 call from a neighbor, Dexter Babbitt, Snoop Harris' first cousin, regarding shots fired at Harris' home. S.C.R. Vol. 5, p. 175. Upon arriving, officers found Ms. Ruffin, who had died from a gunshot wound to her face, sitting upright on the couch with her head tilted back. *Id.* at pp. 149, 238. In her hands was an open book, and next to her on the arm of the couch were several items, including her cell phone, her driver's license and a pack of cigarettes. *Id.* at pp. 170, 212; Vol. 6, p. 274. She had been turning the page of her book when she was shot; indeed, the page was still in her hand. *Id.*

The other victim, Cornelius Harris, was lying on the floor in a pool of blood near the door. S.C.R. Vol. 5, p. 119. Mr. Harris had been shot three times: once in the back of his head, once in the back of his hand, and the other in the back of his shoulder area. *Id.* at pp. 238; Vol. 6, pp. 290-303. While securing the scene, officers found Travon Brown in the bathroom, lying in the bathtub with a gunshot wound to his left hand. S.C.R. Vol. 5, pp. 154, 179-180. Mr. Brown was holding a bottle of beer, and there was a 40 caliber Glock pistol next to him, which he admitted was his weapon. *Id.* at pp. 157-159. As officers instructed Mr. Brown to show his hands, he stated to police, "I didn't know if he was still here or not." *Id.* at pp. 159-160. Mr. Brown left the scene by ambulance. At the hospital,

officers recovered Mr. Brown's clothing, as well as three 40 caliber shell casings and a crack pipe from his jean pockets. *Id.* at p. 234.

Officer Haynes, who was one of the four officers that initially entered the home, testified that the officers walked through a pool of blood as they entered the home and that there was a copious amount of blood at the scene. S.C.R. Vol. 5, pp. 177-178. Officer Haynes added that, to his knowledge, officers did not move anything or disconnect anything during their initial sweep because, at that time, they were securing the scene. *Id.* at pp. 178-179, 182-183. Officer Haynes identified a photograph of an Xbox controller on top of the television in the living room where the bodies were located. *Id.* at p. 183. He also identified a photograph of the Xbox console sitting on the back bedroom floor, noting that it was disconnected and nowhere near a television. *Id.* at p. 183. Officer Mansell, who also entered the home with Haynes, testified regarding the initial sweep of the home, the amount of blood on the scene, and the fact that investigators had to walk through blood to secure the house. *Id.* at pp. 146-166. Officer Mansell stated that once the scene was secured, he went back outside of the home to wait on the detectives and other agencies. *Id.* at p 161.

Detective Brandon Garrett testified that other officers had entered the scene and that Brown had already left the scene by ambulance when he arrived. S.C.R. Vol. 5, pp. 199-200. Officer Haynes gave Detective Garrett a brief regarding the scene, and Garrett worked with other detectives to determine a plan for collecting evidence and preserving the scene. *Id.* at p. 201. Detective Garrett testified that he started photographing the scene before the other detectives came in and collected evidence or disturbed the area, then followed up by making a video of the scene. *Id.* Detective Garrett noted that some photographs had been taken by officers prior to his arrival. *Id.* He testified regarding the evidence collected from Brown's jean pockets, which included three 40 caliber shell casings and a crack pipe. *Id.* at p. 234. Detective Garrett also stated that, at the time he took the

- 11 -

photos and the video, there was no Xbox in the living room, but there were games and controllers. *Id.* at p. 237-238. Detective Garrett further testified that the Xbox console was located in the back bedroom on the floor. *Id.*

Detective Garrett testified that the next day, on September 30, 2011, Travon Brown gave police a statement claiming that the shootings were the result of a confrontation and struggle in the home over an Xbox game. S.C.R. Vol. 6, pp. 241-42. Mr. Brown stated that he and Harris got into an argument over an Xbox football video game they had been playing. *Id.* Mr. Brown's statement, attached to his federal petition for a writ of *habeas corpus*,[8] indicated that when Harris "came at him," his gun "fell out of [his] pants as [he] was trying to get to the door." ECF Doc 1-1, p. 54. Mr. Brown told officers that he and Snoop Harris scuffled, and he didn't want Snoop to get the gun. *Id.* Mr. Brown added that, when the "scuffling stopped I saw blood everywhere and both Snoop and his girlfriend had been shot." *Id.*[9]

The State's firearms expert, Mark Boackle, testified that the shell casings found both at the scene and in Brown's pocket were fired from Brown's weapon. S.C.R. Vol. 6, pp. 317-318. In addition, Boackle also testified that the gun at issue "could only be fired one time for each pull of the trigger" and that "once you pull the trigger, you must release the trigger to be able to fire again." *Id.* at p. 324. Boackle also testified that the gun would not fire if dropped, even if there was a bullet in the chamber. *Id.* at p. 331. Forensic testing on both blood and DNA swabs taken from the weapon in the

---

[8] The statement was marked for identification and received into evidence during the testimony of Detective Garrett. S.C.R. Vol. 5, p. 240.

[9] Mr. Brown argued in pretrial *pro se* pleadings that portions of his statement were "fraudulent," alleging that the circled portions of the statement were incorrect. S.C.R. Vol. 1, p. 41. At trial, neither side argued that the statement, as entered into evidence, was incorrect.

grip and trigger areas revealed only a 1 in 999 trillion chance that the sample did not come from Travon Brown. S.C.R. Vol. 7, pp. 475-477. The forensic testing on the weapon did not match the profile of victim, Cornelius Harris. *Id.* at p. 476-477.

### Grounds Reviewed on the Merits in State Court

The Mississippi Supreme Court has already considered Mr. Brown's remaining claims in Grounds One, Two, and Three on the merits during state post-conviction collateral review and decided those issues against him. Hence, these claims are barred from *habeas corpus* review by the Antiterrorism and Effective Death Penalty Act, 28 U.S.C. § 2254(d), unless they meet one of its two exceptions:

> (d) An application for a writ of *habeas corpus* on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings *unless* the adjudication of the claim—
>
>> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>>
>> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

*Id.* (emphasis added). The first exception, subsection (d)(1), applies to questions of law. *Morris v. Cain*, 186 F.3d 581 (5th Cir. 2000). The second exception, subsection (d)(2), applies to questions of fact. *Lockhart v. Johnson*, 104 F.3d 54, 57 (5th Cir. 1997). Since the petitioner's claims challenge both the application of law and the finding of fact, this court must consider the exceptions in both subsections.

Under subsection (d)(1), a petitioner's claim merits *habeas* review if its prior adjudication "resulted in a decision that was *contrary to*, or involved an *unreasonable*

*application* of, clearly established Federal law." *Id.* (emphasis added). A state court's decision

is *contrary to* federal law if it arrives at a conclusion opposite to that reached by the United

States Supreme Court on a question of law, or if it decides a case differently from the Supreme

Court on a set of "materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 120

S.Ct. 1495, 1523 (2000). A state court's decision involves an *unreasonable application of*

federal law if it identifies the correct governing principle but unreasonably (not just incorrectly)

applies that principle to facts of the prisoner's case; this application of law to facts must be

*objectively* unreasonable. *Id.* at 1521. As discussed below, the petitioner has not shown that the

Mississippi Supreme Court unreasonably applied the law to the facts, or that the court's decision

contradicted federal law. Accordingly, the exception in subsection (d)(1) does not apply to the

remaining claims in Grounds One, Two, and Three of the petitioner's claim.

  Nevertheless, under § 2254(d)(2) these grounds may still merit review if the facts to

which the supreme court applied the law were determined unreasonably in light of the evidence

presented. Because the supreme court is presumed to have determined the facts reasonably, it is

the petitioner's burden to prove otherwise, and he must do so with clear and convincing

evidence. *Miller v. Johnson*, 200 F.3d 274, 281 (5th Cir. 2000); 28 U.S.C. § 2254(e)(1). As

discussed below, the petitioner has failed to meet this burden; as such, he cannot use subsection

(d)(2) to move these claims beyond § 2254(d), which bars from *habeas corpus* review issues

already decided on the merits.

**Ineffective Assistance of Counsel**

  Mr. Brown frames his remaining claims in Grounds One, Two, and Three as ineffective

assistance of counsel. The court must address claims of ineffective assistance of counsel under the

two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674

- 14 -

(1984). To prove that defense counsel was ineffective, the petitioner must show that counsel's performance was deficient – and that the deficiency resulted in prejudice to her defense. Under the deficiency prong of the test, the petitioner must show that counsel made errors so serious that he was not functioning as the "counsel" guaranteed by the Sixth Amendment. *Strickland*, 466 U.S. at 687. The court must analyze counsel's actions based upon the circumstances at the time – and must not use the crystal clarity of hindsight. *Lavernia v. Lynaugh*, 845 F.2d 493, 498 (5th Cir. 1988). The petitioner "must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U.S. at 689 (citation omitted). To prove prejudice, the petitioner must demonstrate that the result of the proceedings would have been different or that counsel's performance rendered the result of the proceeding fundamentally unfair or unreliable. *Vuong v. Scott*, 62 F.3d 673, 685 (5th Cir. 1995), *cert. denied*, 116 S.Ct. 557 (1995); *Lockhart v. Fretwell*, 506 U.S. 364, 369 (1993); *Sharp v. Johnson*, 107 F.3d 282, 286 n.9 (5th Cir. 1997). "When §2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Harrington v. Richter*, 131 S.Ct. 770, 788 (2011); *Premo v. Moore*, 131 S.Ct. 733 (2011).

### Ground One: Trial Counsel Failed to Allege that Law Enforcement Officers Moved the Xbox – and to Object to "Missing" Evidence (a Bloody Carpet Sample)

Mr. Brown's theory of defense was that Cornelius "Snoop" Harris was the aggressor and that Brown was defending himself when he shot Harris – and that he accidentally shot Ms. Ruffin during the struggle. Mr. Brown argues that the evidence at the scene (including the absence of the bloody carpet sample) supports his version of events – that a scuffle over a video game led either to the accidental shooting of both victims – or that he acted in self defense after Cornelius Harris attacked him. The evidence to which Mr. Brown refers is bloody footprints in the back bedroom next to the

Xbox game console. He believes that counsel should have argued that law enforcement officers moved the Xbox from the living room into the back bedroom in an effort to undermine his theory of the case (self-defense as to Cornelius Harris and accidental shooting as to Ms. Ruffin.) Mr. Brown also argues that the State intentionally suppressed the results of DNA testing of blood on the carpet in the bedroom (which he believes to be from the footprints visible in the photograph attached to the instant petition) because the results would have revealed the blood to be that of Cornelius Harris.

### Moving the X-box

Mr. Brown argues that the presence of bloody footprints near the Xbox in the back bedroom proves that police officers moved the Xbox from its alleged initial location (attached to the television in the living room area) and placed it in the back bedroom, where it was later photographed. The photographs clearly show the position of the Xbox (with the power cord and other wires attached), as well as bloody footprints nearby. Mr. Brown believes that counsel should have argued that the bloody footprints by the Xbox proved that law enforcement officers moved the Xbox from the living room into the bedroom. Mr. Brown also alleges in the instant petition that he said to the officers who found him in the bathtub, "It started over the Xbox." Doc. 1 at 9. Officer Haynes remembered the statement as, "It was over or something along those lines." SCR Vol. 5 at 181. Mr. Brown gave a more detailed statement to the police about a day later. S.C.R. Vol. 6, pp. 241-42. The court will proceed, for the purposes of this memorandum opinion, under the assumption that Mr. Brown told the police, "It started over the Xbox," as he states in the instant petition. The court could not, however, find that statement anywhere in the record.

This ground for relief is wholly without merit. First, Mr. Brown has not stated *why* any law enforcement officer would seek to manipulate evidence to secure a conviction against him. Second, according to Mr. Brown's theory, one or more police officers had to interpret his cryptic statement ("It

- 16 -

started over the Xbox") to infer that: (1) he and Harris were playing a game on the Xbox (in the living room); (2) a fight broke out after the two argued over the game; (3) Harris was the aggressor; (4) Brown shot Harris in self-defense; and (5) Brown shot Ms. Ruffin by accident during the struggle. Then, after inferring that sequence of events as Mr. Brown's theory of the case, a law enforcement officer – with the undisclosed grudge against Brown – manipulated evidence at the scene by moving the Xbox from the living room into the back bedroom. To move the Xbox, the officer would first have needed to unplug it from the TV and the wall – and turn off the TV (as no witness reported that the TV was on when law enforcement and emergency personnel arrived). Also, the officer would have to have done so in such a way that the many other law enforcement officers and emergency personnel at the scene did not see him do it. Otherwise, if the others at the scene saw him move it, they were complicit with him in the manipulation of evidence. To characterize this sequence of events as implausible is an understatement. In addition, Mr. Brown has not contested the fact that officers, indeed, stepped in Snoop Harris' blood and tracked the blood throughout the house. He has not explained why he believes that the bloody footprints on the floor in the bedroom were not created by an officer securing the scene. For these reasons, the court declines to second-guess counsel's strategic decision not to raise this issue at trial, and this ground for relief is without substantive merit.

### Failure to Test Blood on the Carpet Sample

No one disputes that Mr. Harris' blood had formed a large pool near the entrance to the home, and no party has disputed that it was Harris' blood the police tracked all over the home when they secured it after their initial entry. The officers admitted that they stepped in the pool of blood near the entrance of the home and tracked it to many locations throughout the house as they secured it. Indeed, the bloody footprints by the Xbox almost certainly came from the feet of the officer securing the bedroom on initial entry. Hence, the fact Mr. Brown seeks to establish (that the footprints visible next

to the Xbox were made with Harris' blood) is undisputed. Thus, counsel had no need to seek testing

of that blood sample, as all parties agreed that the blood came from Cornelius "Snoop" Harris. This

ground for relief is without substantive merit.

### The Issues Mr. Brown Raises Now Were for the Jury to Decide

In any event, the issues Mr. Brown raises in this ground for relief were matters of fact for the

jury to decide. Essentially all the evidence introduced at trial tended to prove Mr. Brown's guilt –

especially the position of Felisha Ruffin's body, which greatly undermined the defense's theory of the

case that she was shot during a struggle initiated by Snoop Harris. At the time she was shot, she was

sitting, relaxed on the couch, in the process of turning the page of the book she was reading. Doc. 24-

5 at 95-96. She was killed instantly by a shot to the face, with stippling around the bullet wound

(showing that the gun discharged close to her skin). Doc. 24-6 at 60-61, 66-67. It is highly

improbable that Ms. Ruffin sat, calmly reading her book, while her boyfriend and Brown engaged in a

brutal life-or-death struggle for control of Brown's gun, with bullets flying in all directions. The most

likely scenario is that Ms. Ruffin was shot first, before the struggle began, and it appears that the jury

came to that conclusion. There is no dispute that a struggle between the two men took place.

Telvis Ragin testified that, earlier that day, Mr. Brown said that he was going to kill somebody,

then asked, "You know Snoop?" Doc. 24-6 at 95, 99-100. Dexter Babbitt, Snoop Harris' first cousin,

testified that he saw the struggle from the street and that – when Snoop Harris tried to escape – Brown

pulled him back into the house, shut the door, and, once Harris was back inside, another shot rang out.

Doc. 24-7 at 10-12, 17. He also testified that the back door to the house gets stuck closed, and he

heard someone rattling that door after the shooting stopped. Doc. 24-7 at 43-45. Mr. Babbitt believed

that Brown made the noise as he was trying to exit through the jammed back door. *Id.* at 45.

- 18 -

Further, Brown collected some of the spent shell casings – a possible attempt to remove evidence from the scene. Doc. 24-5 at 120. His effort to collect the casings could have been cut short by the rapid arrival of law enforcement officers, as Mr. Babbitt could see the blue lights of the police cars even as the final shot rang out. Doc. 24-7 at 14-15. Thus, after the life-and-death struggle, Brown collected the shell casings, retrieved his beer, took them and the gun with him, and climbed to the bathtub, where the police found him almost immediately afterward. Doc. 24-5 at 76-77.

Witness Telvis Ragin testified that Brown threatened him with bodily harm and forced him to sign a strangely-worded document purporting to recant an earlier statement to police. Doc. 24-5 at 108-118. The recantation, entitled "Statement of Prevarication," reads as if the author used a thesaurus to draft it. *Id.* Mr. Ragin, who did not complete high school, could not even pronounce or define many of the words in that statement. For instance, when reading the word "fabrication" in court, he instead said "fornication." Doc. 24-6 at 108, 116. In addition, the document included words such as "conjured," "distraught," "dismay," "despicable," "scandalous," and "conning." Doc. 24-6 at 118-119. Mr. Ragin did not understand the document, but he testified that he signed it because Travon Brown threatened him, telling him that by giving the original statement he was playing "Russian Roulette." Doc. 24-6 at 108-109. Given the strange wording of the document, as well as Mr. Ragin's lack of education and limited vocabulary, the jury could have believed Mr. Ragin's testimony that Travon Brown coerced the recantation from him by threat of bodily harm.

Two of the three bullet wounds Snoop Harris suffered were to the back of his body and the back of his head. Doc. 24-5 at 124. Though not definitive, this tends to show that Brown got the upper hand and shot Harris as he fled, consistent with the testimony of Harris' cousin Dexter Babbitt that Brown dragged Harris back into the home as he tried to flee. Doc. 24-7 at 11-12. Travon Brown was the donor of *all* the DNA collected from the firearm. Doc. 24-7 at 112-113. The gunshot residue

- 19 -

recovered from Snoop Harris' hand is also consistent with a struggle for control of the gun (neither side contested the fact that a struggle occurred.) Doc. 24-7 at 98-99.

The prosecution noted that, to fire one round from the Glock 22, the shooter must pull the trigger fully. Doc. 24-6 at 85, 91-92. Then, to fire the next round, the shooter must release the trigger and pull the trigger fully a second time. *Id.* The prosecution then noted that Snoop Harris suffered gunshot wounds in three locations: the back of his wrist, the back of his shoulder, and the back of his head. Doc. 24-5 at 124; Doc. 24-6 at 50-51. Thus, it appears that Travon Brown was behind Harris when he fired the three shots. The prosecution argued that the shots to Snoop Harris' back and the back of his head could not have occurred accidentally during the struggle as Mr. Brown described. Doc. 24-9 at 77. The argument is difficult to refute, and Brown's counsel did not address it during closing arguments (likely in an effort not to call further attention to a weakness in the defense's case.) For all the reasons set forth above, the State put on a powerful case to establish Mr. Brown's guilt.

### Inconsistencies in the Prosecution's Case

There were, nonetheless, a few inconsistencies or oddities about the prosecution's case, and defense counsel exploited those that he could. First, there was no evidence at all establishing a motive for the murders. Motive is not an element of murder with deliberate design under Mississippi law, but in most cases the prosecution provides enough evidence to at least infer one. Also, establishing a motive would have helped the prosecution prove deliberate design. There was no proof of motive introduced at trial, and defense counsel pointed out this weakness in the prosecution's case during closing arguments.

Also, Snoop Harris' cousin Dexter Babbitt testified that both Brown and Harris were wearing white T-shirts at the time of the murders, but the only such shirt recovered from the scene was on the

body of Snoop Harris.[10] Doc. 24-7 at 20-21. Brown was wearing a red plaid shirt on the night of the murders, and there is no proof that he wore a white T-shirt underneath. Doc. 24-8 at 41-42, 47. Indeed, video captured in a nearby convenience store shortly before Mr. Brown went to Snoop Harris' home tends to show that Mr. Brown was wearing the red and black shirt – and had no T-shirt underneath. Doc. 24-8 at 41-43. Defense counsel addressed this discrepancy during closing arguments, as well.

It is also unclear why the Xbox was disconnected from the television and placed in a room with no way to use it, especially when the video games, controllers, and other "peripherals and paraphernalia" associated with the game were in the living room. S.C.R. Vol. 6 at 252. Defense counsel did *not* address this fact, likely because it undermines Mr. Brown's defense. The natural question one might ask is, "How could Travon Brown and Snoop Harris have played the football game in the living room just before the shooting when the Xbox was unplugged – lying on the floor in the back bedroom?" Indeed, the prosecutor brought up this very inconsistency during closing arguments. Doc. 24-9 at 46. Again, defense counsel chose not to address this issue, as the court discussed in detail above.

Harris' cousin, Dexter Babbitt, testified that a final shot rang out about 6 to 7 *minutes* after Brown dragged Snoop back into the house, but Babbitt's girlfriend, Jeanette Ray, testified that she heard the final shot in a matter of 12 to 13 *seconds* after Snoop Harris was dragged back into the house. Doc. 24-7 at 19, 84. Defense counsel mentioned this twice during closing arguments.

---

[10] The photograph of Snoop Harris entered into evidence at trial does not appear to be part of the record in this case; however, all parties agreed that Mr. Harris was wearing a white T-shirt at the time of his death.

Mr. Brown's defense attorney pointed out these inconsistencies in the prosecution's case to the jury. Counsel chose to focus the jury's attention on whether the evidence at the scene supported a finding beyond a reasonable doubt that the murders were *deliberate* – by arguing that the shots were fired as a result of an unexpected struggle over a video game, rather than as a result of planning. Defense counsel did not argue that Snoop Harris was the shooter. The fact that Snoop Harris' injuries were all to the back side of his body makes clear that Brown shot him, and the position of Felisha Ruffin's body tends to show that she was shot before a struggle occurred. Counsel made these arguments and several more during closing. He carried out this trial strategy through the cross-examination of the State's witnesses, the examination witnesses for the defense, and during closing arguments.

**The Jury's Role**

Then, the *jury* considered the evidence, made factual findings in the case, and arrived at a verdict, precisely as the system was designed. The Founders established in our Constitution that an accused has the right to a trial by jury in a criminal case. "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, *by an impartial jury* of the State and district wherein the crime shall have been committed...." U.S. Const. amend. VI. (emphasis added). The requirement of jury trial in a criminal case is applicable to the states through the Fourteenth Amendment. *Duncan v. Louisiana*, 391 U.S. 145, 156 (1968). It is the province of the jury to determine the facts in a criminal case – and apply to those facts the law given by the court through jury instructions. "Juries are typically called upon to render unanimous verdicts on the ultimate issues of a given case." *McKoy v. North Carolina*, 494 U.S. 433, 449, 110 S. Ct. 1227, 1236, 108 L. Ed. 2d 369 (U.S. 1990) (plurality opinion) (Blackmun, J., concurring). Indeed, in a very recent Supreme Court case, a majority of the Court reaffirmed this pillar of American

- 22 -

criminal law. *See Ramos v. Louisiana,* ___ U.S. ___, 2020 WL 1906545 (April 20, 2020). The arguments Mr. Brown has raised in this case are all factual issues that the jury resolved. That is not an error, but a feature of the American justice system. This ground for relief is without substantive merit.

### Mr. Brown's Traverse

In his Traverse, Mr. Brown largely re-urges the arguments he advanced in his petition, such as his belief that the State should have analyzed the DNA from the bloody footprints found on the carpet next to the Xbox in the back bedroom. He believes that DNA would reveal the blood to have come from Cornelius Harris. As discussed above, all parties agreed that the blood came from Cornelius Harris, as law enforcement officers testified that they walked through Mr. Harris' blood upon entering the house and tracked it into every room while securing the area. Such testing would not have advanced Mr. Brown's defense. He characterizes the alleged failure to test the blood sample as a *Brady* violation. *See Brady v. United States,* 373 U.S. 83 (1963).

In *Brady*, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87. The Fifth Circuit has addressed this issue:

> To establish a *Brady* claim, a habeas petitioner must demonstrate that (1) the prosecution suppressed evidence, (2) the evidence was favorable to the petitioner, and (3) the evidence was material. *U.S. v. Ellender*, 947 F.2d 748, 756 (5th Cir. 1991) (citations omitted). In assessing the materiality of suppressed evidence, the Supreme Court explained that "evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *U.S. v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985). "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Id.*, at 682, 105 S.Ct. at 3383. Recently, the Court further observed that a "reasonable probability" of a different result is shown when the non-disclosure "could reasonably be taken to put the whole case in such a

different light as to undermine confidence in the jury verdict." *Kyles v. Whitley*, 514
U.S. 419, ----, 115 S.Ct. 1555, 1566, 131 L.Ed.2d 490 (1995) (footnote omitted). "[A]
showing of materiality does not require demonstration by a preponderance that
disclosure of the suppressed evidence would have resulted ultimately in the
defendant's acquittal." *Id.* at ---- , 115 S.Ct. at 1566. Finally, the materiality inquiry is
applied to "the suppressed evidence collectively, not item-by-item." *Id.* at ----, 115
S.Ct. at 1567.

*Spence v. Johnson*, 80 F.3d 989, 994-995 (5ᵗʰ Cir. 1996) . "[T]he materiality of *Brady* evidence

depends almost entirely on the value of the evidence relative to the other evidence mustered by the

State.'" *Id.* at 994-995 (citations omitted).

As discussed at length above, the evidence showed – and the parties agreed – that the blood

from the footprints near the Xbox was from Cornelius Harris, and the police admitted tracking Mr.

Harris' blood all over the house while securing the scene. Thus, the evidence was neutral[11], which

does not meet the standard to establish a claim under *Brady*. *United States v. Nixon*, 881 F.2d 1305,

1308 (1989). This allegation is without substantive merit.

Mr. Brown also argues in his Traverse that the State withheld or destroyed "the test results of

Cornelius Harris['] … DNA *found on the Glock pistol*." Doc. 26 at 2 (emphasis added). However, the

only "proof" he offers to support this contention is that Mr. Harris had gunshot residue on his right

hand, but the DNA test of the Glock pistol matched only Mr. Brown. Doc. 1-2 at 44. Thus, Mr.

Brown argues that Snoop Harris necessarily left his DNA on the pistol. Expert testimony established,

however, that gunshot residue may be deposited on a surface (including skin) if the weapon is

---

[11] Mr. Brown offers one theory regarding the source of the bloody footprints (that an officer
moved the Xbox to the back bedroom), while the evidence admitted at trial tended to show that
officers entering the home tracked the blood into essentially every room as they secured the scene. As
discussed in detail above, the probability that the tracks were from an officer relocating the Xbox is
vanishingly small. Thus, given the other evidence available to the jury, the footprint evidence might
well have tended to show Mr. Brown's guilt by undermining his current theory of the case. For the
purposes of this memorandum opinion, however, the court will treat the evidence as neutral.

discharged in the vicinity of that surface. Doc. 24-7 at 95-99. Gunshot residue may also be transferred when a second surface touches the one containing residue. *Id.* Thus, it is possible for Mr. Harris to have had gunshot residue on his hand through proximity to a weapon as it discharged or contact with a surface with such residue on it – without having actually touched the weapon, himself. Both scenarios could easily have occurred based on the struggle over the pistol. In that case, Mr. Harris could have gotten gunshot residue on his hand without transferring his DNA to the Glock pistol. As such, there is no proof that DNA testing showed that Cornelius Harris' DNA was collected from the Glock pistol; indeed, the test results clearly show that the *only* DNA recovered from the Glock pistol came from Travon Brown. S.C.R. Vol. 7, pp. 475-477. This allegation is wholly without merit.

### Conclusion

For the reasons set forth above, the instant petition for a writ of *habeas corpus* will be denied. A final judgment consistent with this memorandum opinion will issue today.

SO ORDERED, this the ___28th___ day of April, 2020.

_____
SENIOR UNITED STATES DISTRICT JUDGE

- 25 -